UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH CLARK,<br><br>                Petitioner,<br><br>      v.<br><br>MATTHEW CATE, Secretary,<br>California Department of Corrections<br>and Rehabilitation,<br><br>                Respondent. | Case No. ED CV 10-1081 DMG (JCG)<br><br>**ORDER ACCEPTING SECOND REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE AND DENYING CERTIFICATE OF APPEALABILITY** |

**I.**

**INTRODUCTION AND BACKGROUND**

In accordance with the mandate of the Ninth Circuit Court of Appeals, this matter is before the Court to determine whether petitioner Kenneth Clark ("Petitioner") meets the "actual innocence" standard articulated in *Schlup v. Delo*, 513 U.S. 298 (1995), such that his untimely federal habeas petition ("Petition") can proceed on the merits. [Doc. # 28 at 3-7.] The Magistrate Judge presided over an evidentiary hearing ("Federal Evidentiary Hearing") to allow Petitioner an opportunity to make a credible showing of actual innocence in connection with his conviction for the second-degree

murder of Misael Rosales in May 2004. [*See* Doc. ## 76-77 (together, "Federal Hearing Transcript" or "Fed. Hr'g Tr.").] Thereafter, the Magistrate Judge issued a second Report and Recommendation ("Second R&R"), recommending the dismissal of the action with prejudice because the Petition is untimely, and Petitioner's claim of actual innocence did not meet the exacting standard set forth in *Schlup*. [Doc. # 91.] Petitioner timely filed objections to the Second R&R ("Objections"). [Doc. # 93.]

Pursuant to 28 U.S.C. § 636, the Court has reviewed the Petition, the Second R&R, Petitioner's Objections, and the entire record. After having made a careful and thorough *de novo* determination of the portions of the Second R&R to which the Petitioner has objected, the Court concurs with and adopts the findings, conclusions and recommendations of the Magistrate Judge. There are a few issues, however, that warrant brief amplification.

Petitioner first objects to the Magistrate Judge's findings that a juror could reasonably credit Monroe Thomas's pretrial statements and trial testimony over his contradictory post-trial statements. Specifically, Petitioner contends that: (1) the record rebuts the Second R&R's conclusion that Monroe Thomas's post-trial statements were coerced; (2) the testimony of Tia Shakir, Charvette McGee, and Mrs. Clark was credible; (3) the Second R&R mischaracterized Monroe Thomas's "reluctance" to affirm his post-trial statements; and (4) Monroe Thomas did not see the shooting. (Objections at 4-9.)

The Court is not persuaded, however, that a reasonable juror would credit Monroe Thomas's post-trial statements, for several reasons.

First, to the extent that Monroe Thomas' post-trial statements recant his trial testimony, such recantation testimony is usually reviewed with skepticism. *See, e.g., Jones v. Taylor*, 763 F.3d 1242, 1248 (9th Cir. 2014) (quoting *Dobbert v. Wainwright*, 468 U.S. 1231 (1984) (Brennan, J., dissenting from denial of certiorari)); *Allen v. Woodford*, 395 F.3d 979, 994 (9th Cir. 2005) (finding that witness's "recantation

testimony is even more unreliable because his trial testimony implicating petitioner is consistent with the other evidence, while his recantation is not"); *Nooner v. Hobbs*, 689 F.3d 921, 935 (8th Cir. 2012) (upholding recantation adverse credibility assessment where there were inconsistencies between declarations and evidentiary hearing testimony, motivations for recanting, and the witness had a "history of making contradictory statements in [the] case").

Second, such skepticism is particularly appropriate give the circumstances surrounding Thomas' post-trial statements. *See Jones v. Taylor*, 763 F.3d 1242, 1248 (9th Cir. 2014) (noting that a witness's recantation must be "considered in addition to his trial testimony and in the context in which he recanted"). Notably, after the trial, Monroe Thomas felt pressured to "help [Petitioner]," as "people [who] knew [Petitioner]" had – with a "certain look" – told Thomas' nephew that Thomas needed to "watch out." (*See* Fed. Hr'g Tr. at 73-74, 79-80.)

Third, although Monroe Thomas testified at the Federal Evidentiary Hearing that he "didn't see [Petitioner] shoot Miguel [Rosales]," he reiterated again that "at the time" of the shooting, he was afraid of Petitioner. (Fed. Hr'g Tr. at 58, 74.) Although Monroe Thomas did not identify the reason why he would have been afraid of Petitioner, a reasonable juror could find that this fear would make sense only if he truly believed that Petitioner *was* the shooter. Furthermore, when asked why he initially identified Petitioner as the shooter, Monroe Thomas replied, "My friend was dead. And he was the one that we were in the situation with." (*Id.* at 72.)

Ultimately, although Monroe Thomas testified at the State Evidentiary Hearing that Petitioner had not hit him and that someone other than Petitioner had been carrying a gun (Pet. Ex. 105 at 10-11, 31, 33), this testimony was effectively disavowed by Monroe Thomas himself during his cross-examination at the Federal Evidentiary Hearing, where he stated clearly that Petitioner had hit him and brandished a gun. (*See* Fed. Hr'g Tr. at 54-56.) Even when the Deputy Public Defender – during

re-direct examination – attempted to elicit the same testimony Monroe Thomas had given at the State Evidentiary Hearing, Monroe Thomas only stated that he could not remember "exactly" who hit him, and that he had "seen two guns," one of which belonged to someone other than Petitioner. (*Id*. at 64-66, 68.) Importantly, these statements do not contradict the testimony that Petitioner gave at trial or during cross-examination at the Federal Evidentiary Hearing.

As for Petitioner's objections to the Second R&R's conclusion that a reasonable juror would not credit the testimony of Petitioner's eyewitnesses – Paul Leonard Terry ("Terry"), Lafennus Jamal Lindquist ("Lindquist"), Willie Owens ("Owens"), and Coral Denise Nettles ("Nettles") – that Buddha[1] shot Rosales, the Court agrees with the Second R&R's conclusion, and finds that their testimony is not reliable evidence of Petitioner's actual innocence.

First, the significant delay in these eyewitnesses coming forward with any version of this alternative story – 11 years after Petitioner's criminal trial – does bear on the reliability of this new evidence. *See Schlup*, 513 U.S. at 332; *see also McQuiggin*, 569 U.S. at 385 ("A federal habeas court, faced with an actual innocence gateway claim, should count unjustifiable delay on a habeas petitioner's part, not as an absolute barrier to relief, but as a factor in determining whether actual innocence has been reliably shown."). In fact, many of the reasons ostensibly presented for now coming forward existed before the Federal Evidentiary Hearing. For example, although Terry states that he can come forward now because he is a "different person" who longer engages in criminal activity (*see* Fed. Hr'g Tr. at 144), it appears that he had not engaged in any criminal activity for at least several years before the Federal Evidentiary Hearing. (*See* Resp. Ex. 204.) Similarly, Lindquist says that he can testify now that he has successfully avoided the "rift-raft" that worried him initially (*see* Fed. Hr'g Tr. at 185). Yet, he too has been away from that criminal activity for several

---

[1] Consistent with both the Second R&R and Petitioner's Objections, this Court refers to Duval Thomas as "Buddha."

4

years.  (*See* Resp. Ex. 209.)  By contrast, Owens' stated reason for waiting 11 years to come forward – a reluctance to disrupt his relationships with Buddha's relatives – is wanting, insofar as Owens acknowledged that he maintains relationships with Buddha's relatives to this day.  (*See* Fed. Hr'g Tr. at 215-16, 248-49.)  Hearing these explanations, a jury could reasonably conclude that Lindquist and Owens testified at the Federal Evidentiary Hearing mainly, if not solely, because Terry asked them to. (*See id.* at 215-16, 248-49.)  Petitioner thus fails to persuade the Court that the fact that "these witnesses are no longer living criminal existences is entirely consistent with their willingness to now testify."  (*See* Objections at 13.)

Second, the testimony of Petitioner's eyewitnesses raises serious credibility issues due to their personal relationships with Petitioner and his family, and their criminal histories.  *See House*, 547 U.S. at 552 (observing that testimony from eyewitnesses with no evident motive to lie "has more probative value than, for example, incriminating testimony from inmates, suspects, or friends or relations of the accused").

Third, Petitioner's characterization of the variations within the four eyewitnesses' testimony as "minor" inconsistencies is inaccurate.  Rather, the testimony of the new eyewitnesses is inconsistent in key ways.  For instance, and as the second R&R noted, Terry testified that he helped Petitioner examine the damage to his car at the scene of the accident, and Nettles testified that she helped Petitioner's then-girlfriend, Jessica, at the scene of the accident.  Yet, Nettles testified that she never saw Terry, whom she knew, that night.  [*Compare* Doc. # 76 at 138-39 *with* Doc. # 77 at 309, 357-57, 367.]  Additionally, some of the witnesses remembered the screams of Petitioner's girlfriend – when the victim accidentally backed up with his car and pinned her between Petitioner's car door and car – while others did not.  [*Compare* Doc. # 76 at 158, 59, Doc. # 77 at 324, 360, 367 *with* Doc. # 76 at 175, 238.]  Furthermore, there was varying testimony regarding the size of the crowd that

witnessed the accident.  Owens remembered seeing 10 to 15 people, while Nettles remembered seeing a hundred people in the parking lot and around 30 people near Petitioner's car.  [*Compare* Doc. # 76 at 252 *with* Doc. # 77 at 337, 355.]  Interestingly, all four of these witnesses claimed to be completely sober on the night of the shooting, despite the fact that it took place at 1:00 a.m. outside a liquor store, a drug-dealing hotspot, and a "dirty dancing" motorcycle club party.  [*See* Doc. # 76 at 19, 118-19, 198, 125-26, 167, 205; Doc. # 77 at 310, 314, 354.]

Moreover, the alternate murder narrative presented by the new eyewitnesses is ultimately unconvincing.  As the Second R&R noted, there is "no evidence that the victim was robbed – of the buffer or anything else."  (Second R&R at 18 n. 18.)  [*See also* Doc. # 76 at 208-09, 211; Doc. # 77 at 366-67.]  Notably, the "instigating" or "heckling" described by the witnesses was aimed at Monroe Thomas and the victim, and was about the accident involving Petitioner's car and girlfriend.  [*See* Fed. Hr'g Tr. at 71-72 ("*They hit the car.  We can get paid.*"); *id.* at 137-38 ("*Ooh, he bumped into your car.  He fucked up your car.  Get him.  He fucked up your car man.*"); *id.* at 210-11 ("As soon as the [victim] backed into the car, the people started going crazy and like *Hey, F-that*, cursing and everything, trying to tell [Petitioner] to come on out, and [Petitioner] was going to do this and that and F-him and all that stuff."); *id.* at 323-34 ("*Stop.  Pull up.  Pull up. . . . You just backed up.  What are you doing?*"].  At that point, according to Monroe Thomas, no one was talking about the buffer.  (*Id.* at 79.)  As such, the Court rejects the notion that under these circumstances, Petitioner would not possibly have shot the victim, but Buddha potentially would have done so because of the buffer.

More importantly, the testimony of Petitioner's new eyewitnesses supports Petitioner's guilt because it provides "a more robust motive for Petitioner's murder of the victim" for the reasons stated in the Second R&R.  (*See* Second R&R at 19-20.)

1      In sum, Petitioner has failed to establish that it is "more likely than not that no

2 reasonable juror would have convicted [Petitioner] in light of the new evidence."

3 *Schlup*, 513 U.S. at 316.

4      Accordingly, IT IS ORDERED THAT:

5      1. The Report and Recommendation is approved and accepted;

6      2. Judgment be entered denying the Petition and dismissing this action with

7 prejudice; and

8      3. The Clerk serve copies of this Order on the parties.

9      Additionally, for the reasons stated in the R&R and above, the Court finds that

10 Petitioner has not made a substantial showing of the denial of a constitutional right.

11 *See* 28 U.S.C. § 2253; Fed. R. App. P. 22(b); *Miller-El v. Cockrell*, 537 U.S. 322, 336

12 (2003). Thus, the Court declines to issue a certificate of appealability.

13

14  DATED: April 5, 2018

15 _____

16              DOLLY M. GEE
         UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26

27

28